1   Steve W. Berman (WSB 12536)
    HAGENS BERMAN SOBOL SHAPIRO LLP
2   1918 Eighth Avenue, Suite 3300
    Seattle, WA 98101
3   (206) 623-7292
    steve@hbsslaw.com
4
    Elaine T. Byszewski (*pro hac vice* pending)
5   HAGENS BERMAN SOBOL SHAPIRO LLP
    301 N. Lake Avenue, Suite 920
6   Pasadena, CA 91101
    (213) 330-7150
7   elaine@hbsslaw.com

8   *Attorneys for Plaintiff and the Proposed Class*

9

10                  UNITED STATES DISTRICT COURT

11                 WESTERN DISTRICT OF WASHINGTON

12

13   JAIME SILVA, on behalf of himself and all others     Case No.  2:18-cv-324
     similarly situated,
14                                                         CLASS ACTION
                                       Plaintiff,
15                                                         **COMPLAINT**
             v.
16                                                         DEMAND FOR JURY TRIAL
     WAL-MART STORES, INC., a Delaware
17   corporation; MICHAEL FOODS, INC., a
     Delaware corporation; and M.G. WALDBAUM
18   COMPANY a/b/n WILLAMETTE EGG FARMS
     a/b/n NEST FRESH EGG FARMS, a Nebraska
19   corporation.

20                                    Defendants.

21

22

23

24

25

26

27

28



**TABLE OF CONTENTS**

**Page**

I.    OVERVIEW ........................................................................................................................1

II.   PARTIES .............................................................................................................................3

III.  JURISDICTION AND VENUE ..........................................................................................4

IV.   FACTUAL ALLEGATIONS ..............................................................................................4

      A.   Defendants Are Responsible for the Marketing and Sale of Store-Brand
           Eggs for Walmart, Labeled as Having Come From Hens "With Outdoor
           Access." ....................................................................................................................4

      B.   The Hens Producing Nest Fresh's Store-Brand Eggs for Walmart Are
           Actually Confined to Industrial Barns, Without Outdoor Access. ..........................6

      C.   The "With Outdoor Access" Label Is Material to Consumers. ................................9

      D.   Eggs Touting Animal Welfare Attributes Command a Significant Price
           Premium Over Conventional Eggs. .......................................................................14

V.    CLASS ACTION ALLEGATIONS ..................................................................................16

VI.   CAUSES OF ACTION .....................................................................................................18

      COUNT ONE VIOLATION OF THE WASHINGTON CONSUMER
      PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *ET SEQ.*) .........................18

      COUNT TWO UNJUST ENRICHMENT ........................................................................19

PRAYER FOR RELIEF ..............................................................................................................20

JURY TRIAL DEMAND .............................................................................................................20

010691-13 1005682 V2



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Plaintiff Jaime Silva (plaintiff) brings this action on behalf of himself and all others similarly situated against Wal-Mart Stores, Inc., a Delaware corporation; Michael Foods, Inc., a Delaware corporation; and its subsidiary M.G. Waldbaum Company a/b/n Willamette Egg Farms a/b/n Nest Fresh Egg Farms, a Nebraska corporation (collectively, defendants). Plaintiff's allegations against defendants are based upon information and belief and upon investigation of plaintiff's counsel, except for allegations specifically pertaining to plaintiff, which are based upon his personal knowledge.

## I.    OVERVIEW

1.    America's largest and most profitable food companies should be honest and forthright in their dealings with consumers. When these food companies fail to uphold their responsibility for ensuring truthful advertising to consumers, such consumers are deceived into paying more for products or buying products that they otherwise would not have. Such food companies should be required to make restitution to the consumers they have deceived.

2.    Walmart is the largest and most profitable retailer in the world. Walmart is responsible for the marketing and sale of shell eggs to consumers across the United States, including in Washington, under various store brands, including its own private label.

3.    Michael Foods, Inc. is one of the largest food conglomerates in the United States. Its wholly owned subsidiary, M.G. Waldbaum Company a/b/n Willamette Egg Farms LLC a/b/n Nest Fresh Egg Farms (collectively, Nest Fresh) is responsible for the production and marketing of shell eggs to consumers in Washington under a private label for Walmart.

4.    Defendants market these private label eggs as having provided the laying hens "with outdoor access." Consumers typically pay a significant premium for such eggs, due to the touted improvements to the welfare of laying hens, which is itself important to consumers as well as the perceived health benefits from eating the eggs of better treated hens.

5.    A recent investigation performed by plaintiffs' counsel, however, demonstrates that the Nest Fresh hens supplying these private label eggs for Walmart do not actually have access to the outdoors.

COMPLAINT
010691-13 1005682 V21

- 1 -



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

6.      Instead, Nest Fresh confines its laying hens to industrial barns without outdoor access. As depicted in the below picture obtained from Nest Fresh's website,[1] there are no chickens outside on the grounds of its self-described organic hen house.  Rather, the hens are kept inside enclosed structures, never stepping foot out onto the pasture surrounding the industrial barns.  The industrial barns have two parts: the central interior and the enclosed porches that run along the side.  The enclosed porches, which purportedly provide outdoor access, are fully roofed and screened.  A reasonable consumer would not consider this outdoor access:



7.      Moreover, each porch can hold only a fraction of the flock housed in the industrial barn.  This is not outdoor access for the laying hens, as promised by defendants to the consumers paying a premium for it.



_____

[1] http://www.willametteegg.com/about-us/farm-tour/.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

8.      Thus, consumers paying more for these eggs have been deceived.  Defendants falsely advertise their "farm fresh" eggs as having been laid by hens "with outdoor access," such that they have failed to meet their basic obligation of truthfulness to consumers.  A recent survey demonstrates that a reasonable consumer believes outdoor access to mean that all animals have access to outdoor pasture and fresh air throughout the day.  Had plaintiff and class members known the truth, they would not have purchased these private label eggs or paid as much for them.

9.      Accordingly, defendants' conduct described herein violates Washington's Consumer Protection Act.  Plaintiff brings this action on behalf of a Washington class for restitution, injunctive relief, and any other relief deemed appropriate by the court.

## II.      PARTIES

10.      Plaintiff Jaime Silva is a resident of Everett, Washington.  During the two years preceding the filing of this complaint, plaintiff regularly purchased Organic Marketside private label shell eggs from Walmart in the state of Washington.  Prior to purchase, plaintiff saw the product packaging stating that the hens were provided "with outdoor access."  Plaintiff would not have purchased the shell eggs or paid as much for them had defendants disclosed the truth.  Plaintiff seeks restitution and injunctive relief requiring defendants to cease their deceptive marketing and sale of private label eggs marketed as providing hens "with outdoor access."

11.      Wal-Mart Stores, Inc., is a Delaware company with its principal place of business in Bentonville, Arkansas.  Wal-Mart is responsible for the marketing and sale of shell eggs to consumers under its Organic Marketside private label.

12.      Michael Foods, Inc., is a Delaware corporation headquartered in Minnetonka, Minnesota.  Its fully owned subsidiary, M.G. Waldbaum Company, is a Nebraska corporation with its principal place of business in Minnetonka, Minnesota.  M.G. Waldbaum Company does business as Willamette Egg Farms, "Oregon's largest commercial egg farm,"[2] which in turn does business as Nest Fresh Egg Farms (collectively, Nest Fresh).  Nest Fresh is responsible for the production,

---

[2] http://www.willametteegg.com/about-us/.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

processing, and marketing of shell eggs to consumers in Washington under the Organic Marketside private label for Walmart.

### III.   JURISDICTION AND VENUE

13.   This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000, and the class includes members who are citizens of a different state than defendant.

14.   This Court has personal jurisdiction over defendant because the injury to plaintiff and class members arises from the marketing and sale of shell eggs in Washington.

15.   Venue is proper in this Court under 28 U.S.C. § 1391(b), because Wal-Mart Organic Marketside shell eggs are sold throughout the State of Washington, including in this judicial district.

### IV.   FACTUAL ALLEGATIONS

**A.   Defendants Are Responsible for the Marketing and Sale of Store-Brand Eggs for Walmart, Labeled as Having Come From Hens "With Outdoor Access."**

16.   Walmart (including Sam's Club) is the "largest retailer in the world," with over 260 million customers and revenue of $485.9 billion for fiscal year 2017.[3]  Its supercenters "offer a one-stop shopping experience by combining a grocery store with fresh produce, bakery, deli and dairy products with electronics, apparel, toys and home furnishings."[4]  Likewise, its neighborhood markets "offer fresh produce, meat and dairy products, bakery and deli items, household supplies, health and beauty aids and a pharmacy."[5]  Wal-Mart markets and sells shell eggs to consumers under its Organic Marketside private label, including those produced and packaged by Nest Fresh.

17.   These private label shell egg cartons are each marked with a USDA plant number associated with the egg processor.  For example, P-1266 is the USDA plant number for one of Nest Fresh's major industrial complexes, located at 31350 S. Hwy 170 in Canby, Oregon[6]:

---

[3] https://corporate.walmart.com/our-story.

[4] https://corporate.walmart.com/our-story/our-business.

[5] *Id*.

[6] https://apps.ams.usda.gov/plantbook/Query_Pages/PlantBook_Query.asp#PlantNumber.



1
2
3
4
5
6
7



8    18.    P-1266 is a certified organic operation for the handling of shell eggs.  Nest Fresh also

9 operates certified organic production facilities located at 31348 S. Hwy 170 in Canby, Oregon.[7]

10 Located on the same or adjacent parcels, P-1266 is the closest processing plant for the organic eggs

11 produced at 31348 S. Hwy 170.  Accordingly, Nest Fresh produces shells eggs at its facilities in

12 Canby, Oregon, and then packages them at its plant in Canby, Oregon, for marketing and sale under

13 private label for Walmart.

14    19.    As depicted, defendants advertise these store brand "farm fresh" eggs as laid by hens

15 "free to roam, nest and perch in a protected barn with outdoor access":[8]

16
17



18
19
20
21
22
23

24    20.    As described below, however, Nest Fresh's hens are confined to industrial barns and

25 do not actually have access to the outdoors.

26
27        [7] https://organic.ams.usda.gov/Integrity/Search.aspx.

28        [8] And plaintiff notes that the abstract packaging is, in part, grass green, with a hen in mid-step.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**B.    The Hens Producing Nest Fresh's Store-Brand Eggs for Walmart Are Actually Confined to Industrial Barns, Without Outdoor Access.**

21.    Along with the packing plant (P-1266) at 31350 S. Hwy 170 in Canby, Oregon, Nest Fresh has multiple industrial poultry houses, hundreds of feet long and housing tens of thousands of hens, as depicted below:



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

22.     Nest Fresh confines its laying hens to such industrial barns without outdoor access. As depicted in the below picture obtained from Nest Fresh's website,[9] there are no chickens outside on the grounds of its self-described organic hen house.  Rather, the hens are kept inside enclosed structures, never stepping foot out onto the grass surrounding the industrial barns.  The industrial barns have two parts: the central interior and the enclosed porches that run along the side.  The enclosed porches, which purportedly provide outdoor access, are fully roofed and screened.  Outside the industrial barn, there is not a chicken in sight.  A reasonable consumer would not consider this outdoor access:





_____

[9] http://www.willametteegg.com/about-us/farm-tour/.  The website lists the address as 31348 S. Highway 170 in Canby, Oregon.  http://www.willametteegg.com/contact/.

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

23.     As depicted above, the porches are completely enclosed—with the same roof as the interior part of the industrial barn, an enclosing wall on one side and enclosing beams with screening on the other side.  Thus, none of the laying hens is able to leave the industrial barn and none has access to the pasture surrounding the industrial barn.  A reasonable consumer would not consider this to be "outdoors."

24.     Moreover, each porch can hold only a fraction of the flock housed in the central interior of the structure.  This does not provide access for all laying hens to the porch—much less to the outdoors, as promised by defendants to the consumers paying a premium for it.



25.     Further, only a smaller fraction still go into the enclosed porches.  There are multiple reasons for this.

26.     Each enclosed porch has popholes through which some hens can pass to enter from the central portion of the barn into the porch and later exit the porch back into the central portion of the barn.  For each barn, however, there are a limited number of popholes, such that any one of the thousands of hens inside each industrial barn would need to travel over an immense quantity of birds to get to a pophole.  But hens are not naturally inclined (or even physically capable) of trampling or flying over much of a massive flock to get to distant popholes.  Rather, the natural behavior of chickens precludes them from aggressively encroaching on the space of other birds in an effort to reach a door.  Thus, the popholes of industrial barns do not provide meaningful access to the enclosed porches—and certainly not access to the outdoors.

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

27.     Thus, a claim that hens housed in such a manner are provided "with outdoor access" is false and misleading both as to "access" and as to "outdoors."  Instead, Nest Fresh's hens are confined to industrial poultry houses and do not have actual outdoor access, rendering defendants' packaging of the eggs false and misleading.  As stated by Cornucopia, Nest Fresh has "tiny screened, roofed porches for the birds to go 'outdoors' yet they get very little natural sunlight in those porches and the majority of the birds (95% to 99%) are still stuck inside the dimly lit barn."[10]

**C.     The "With Outdoor Access" Label Is Material to Consumers.**

28.     Surveys consistently demonstrate that consumers have become increasingly interested in farm animal welfare.  According to an online survey of 1,000 Americans dated June 29, 2016, more than three in four (77%) consumers say that they are concerned about the welfare of animals that are raised for human food, including laying hens.[11]  In addition, "more than two-thirds (69%) of consumers pay some or a lot of attention to food labels regarding how the animal was raised."[12]  And consumers' concern "about how animals are raised has increased over time, as 74% of consumers say they are paying more attention to the labels that pertain to how an animal was raised than they were five years ago."[13]

29.     Part of raising animals in a way beneficial to their welfare includes maintaining living conditions and health care practices in a way that accommodates the health and natural behavior of the animals, including laying hens.  True outdoor access is intended to ensure a production system that provides living conditions that allow the chickens to satisfy their natural behavior patterns and provides preventative health care benefits.  Such true outdoor access contributes to preventative health care management by enabling hens to develop and reproduce under conditions that reduce stress, strengthen immunity, and deter illness.  And true outdoor access affords hens the freedom of choice to satisfy natural behavior patterns.  Being outside in the sunlight to engage in natural

---

[10] https://www.cornucopia.org/egg-report/scrambledeggs.pdf at 78.

[11] https://www.aspca.org/animal-cruelty/farm-animal-welfare/aspca-farm-surveys; https://www.aspca.org/sites/default/files/publicmemo_aspca_labeling_fi_rev1_0629716.pdf.

[12] *Id.*

[13] *Id.*



behaviors like scratching in the soil and pecking in the grass thus improves the welfare of laying hens.  Here is an example of a large-scale egg farm with hens that are actually outdoors in pasture:



30.    Accordingly, the "with outdoor access" claim is material to consumers, and defendants therefore use that purported attribute to tout its product.  But, as set forth above, that claim is false and misleading to consumers.

31.    Indeed, an April 2104 survey of 1,000 consumers nationwide conducted by the American Society for the Prevention of Cruelty to Animals, found that almost seventy percent of consumers (68%) believe outdoor access to mean that "[a]ll animals have access to outdoor pasture and fresh air throughout the day."[14]  Moreover, consumers believe the following should be conditions of outdoor access:[15]

---

[14] http://www.aspca.org/sites/default/files/aspca_organic_labeling_public_memo_4-10-14.pdf.
[15] *Id.*

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594



32.     Thus, it is materially misleading for defendants to claim that the hens are provided "with outdoor access" when a reasonable consumer believes that to mean there is access for the majority of animals at any given time to open pasture and vegetation throughout the day.

33.     Another recent article asks its readers:  "Does 'outdoor access' mean claws on grass? Or are screened-in porches acceptable?"[16]  The overwhelming response was that porches are not acceptable.  For example, consumers had the following to say:

- Yes, of course! How can they call them free range if they can't even go outside?  Tracylekels (9/17/17)

- Yes. If labeled organic and free range, they must eat organic feed and roam outside at will.  BDSmith (9/17/17)

- This is a no brainer.....let the chickens or hens graze outdoors in large fields if you want to be able to call them free range, and organic. The poultry industry has been playing word games with the wording a vast majority of all their products. The public truest has no idea what their purchasing based on these misleading labels, and this is wrong.  Brad (9/17/17)

---

[16] https://www.countable.us/articles/1114-organic-chickens-outdoor-access.

- Yes! We pay more for the eggs and chicken meat with the belief that these animals are treated humanely and with as natural a diet as possible only to find out they are treated as terribly as most factory farmed animals. If I'm gonna pay extra I want them to be out there enjoying outside, eating bugs and being free range!  Abbi (9/17/17)

- 'Porches'? Give me a break--this cute name obscures the fact that this is just a way of reintroducing factory farming for organic hens. Truth in advertising! The standard is about ensuring that consumers know what they are buying, without having to be detectives and visit personally every farm that claims its hens are organic. 100,000 hens in each coop, smack up against another coop, with no outside access, should not be called 'organic.' The whole point of organic regulations is to reconnect the animals with nature. A concrete floor with screening, aka 'porch,' with no grass, sun, natural water source, or room to move is not nature.  Jerise (9/18/17)

- Should free range mean free range? Of course! The real issue seems to be that corporate interests will pay lawyers a huge amount of money to try to twist common language and get around the meaning of the labels in the hopes that the profit they make with delays and arguments and getting away with abuses.   Lucinda (9/18/17)

34.    So it is materially misleading for defendants to claim that laying hens are provided "with outdoor access" when reasonable consumers believe this to mean that the hens can put their claws in the grass—not be confined to enclosed porches.

35.    To be sure, under new, clarifying regulations issued during the Obama administration but presently postponed under the Trump administration until May 14, 2018,[17] defendants would not even qualify for use of the "organic" label under the National Organic Program (NOP), which

---

[17] 82 Fed. Reg. 52643.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

governs use of the term "organic."[18]  Use of "organic" on the label requires, *inter alia*, that there is "access for all animals to the outdoors,"[19] but the comments received by USDA demonstrated "there is a gap between how consumers think birds are raised on organic farms and the actual practices of some—but not all—organic producers"[20] using the porch system, because "consumers expect that organic birds come into contact with soil and vegetation and can exhibit natural behaviors."[21]

36.     Indeed, a recent Los Angeles Times article describes the porch system as a "loophole in organic regulations that has allowed factory egg farms, some with 100,000 hens to a barn, to earn an organic imprimatur without much more than a nod to letting chickens leave their coop—that is, attaching a gated, screened porch to their barns."[22]  And, as an industry insider notes, when you put hens in "a building with no windows, no natural light and a screened porch and label it as 'organic,'" consumers are "going to be a little bit ticked off."[23]

37.     Thus, under the clarifying regulation if and when it becomes effective, Cal-Maine's private label eggs for Walmart here at issue would not even qualify as "organic."[24]  But defendants take their marketing one step further—beyond the purview of the NOP—and affirmatively describe the hens as free to roam "with outdoor access" though that description is false and misleading to a reasonable consumer.

---

[18] 7 C.F.R. §205.102.

[19] 7 C.F.R. § 205.239.

[20] 82 Fed. Reg. 7042, 7068.

[21] USDA Agricultural Marketing Service, National Organic Program, *Organic Livestock and Poultry Practices Final Rule: Questions and Answers* (Jan. 2017), at 1, available at https://www.ams.usda.gov/sites/default/files/media/OLPPExternalQA.pdf.

[22] http://www.latimes.com/business/la-fi-organic-eggs-20171121-story.html.

[23] *Id.*

[24] The clarifying regulation at § 205.241 includes, *inter alia*, the following outdoor space requirements: "(1) Access to outdoor space and door spacing must be designed to promote and encourage outside access for all birds on a daily basis…. (2) At least 50 percent of outdoor space must be soil. Outdoor space with soil must include maximal vegetative cover appropriate for the season, climate, geography, species of livestock, and stage of production…. (4) For layers (Gallus gallus), outdoor space must be provided at a rate of no less than one square foot for every 2.25 pounds of bird in the flock…." 82 Fed. Reg. 7042, 7091.  Outdoor access need not be provided for pullets under 16 weeks of age or during nest box training not to exceed five weeks.  *Id.* at 7092.

And § 205.2 defines soil as the "outermost layer of the earth comprised of minerals, water, air, organic matter, fungi, and bacteria in which plants may grow roots," and vegetation is defined as "[l]iving plant matter that is anchored in the soil by roots and provides ground cover."  *Id.* at 7089.

COMPLAINT
010691-13 1005682 V21

- 13 -

**D.      Eggs Touting Animal Welfare Attributes Command a Significant Price Premium Over Conventional Eggs.**

38.      As further evidence of its materiality to consumers, consumers usually pay a significant price premium for eggs touting animal welfare attributes.  The Nest Fresh eggs marketed and sold at Walmart are no exception.  There is a premium for cage-free eggs as compared to conventional eggs, and a further premium still for cage-free eggs "with outdoor access":

| Shell Egg Product | Specialty Description | Cost |
|---|---|---|
| Great Value (Walmart Brand) | No | $1.86 |
| Marketside (Walmart Brand) | Yes, cage free | $2.98 |
| Organic Marketside (Walmart Brand) | Yes, cage free with outdoor access | $3.97 |

For a premium price:



And for a further premium still:



39.     Thus, consumers pay a significant premium for Nest Fresh's private label eggs for Walmart, and in particular for "outdoor access," which further supports the materiality of their marketing claim to consumers.

40.     Indeed, another major egg producer, Cal-Maine, acknowledges that prices for such specialty eggs are generally higher because their perceived benefits are important to consumers.  As it reports online, "We are one of the largest producers and marketers of value-added specialty shell eggs in the U.S." and "we classify nutritionally enhanced, cage-free, organic and brown eggs as specialty products."[25]  As of 2017, specialty eggs represent 24.69 percent of dozens sold and 50.3 percent of Cal-Maine's sales revenue.[26]  As it explains: "Prices for specialty eggs…are generally higher due to consumer willingness to pay for the perceived increased benefits from those products."[27]

41.     The perceived increased benefits from those products include improved animal welfare for its own sake, as well as improvements to human dietary health resulting from the improved animal welfare.  Indeed, a 2007 research study performed by Mother Earth News found that eggs from hens with true outdoor access to pasture may contain:

- 1/3 less cholesterol;
- 1/4 less saturated fat;
- 2/3 more vitamin A;
- 2 times more omega-3 fatty acids;
- 3 times more vitamin E;
- 7 times more beta carotene; and
- 3 to 6 times for vitamin D.[28]

Other studies make similar claims.  For example:

---

[25] http://calmainefoods.com/company/.

[26] http://calmainefoods.com/media/1133/calm-october-2016.pdf, at 24.

[27] http://calmainefoods.com/company/.

[28] https://www.motherearthnews.com/real-food/free-range-eggs-zmaz07onzgoe.

COMPLAINT
010691-13 1005682 V21

- 15 -



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

- Pasture-raised eggs contain 70% more vitamin B12 and 50% more folic acid (British Journal of Nutrition, 1974);

- Pasture-raised eggs are higher in vitamin E and omega-3s than those obtained from battery-cage hens (Animal Feed Science and Technology, 1998);

- Pasture-raised eggs are 10% lower in fat, 34% lower in cholesterol, contain 40% more vitamin A, and are 4 times higher in omega-3s than standard U.S. battery-cage eggs (Gorski, Pennsylvania State University, 1999); and

- Pasture-raised eggs have three times more omega-3s and are 220% higher in vitamin E and 62% higher in vitamin A than eggs obtained from battery cage hens (Karsten, Pennsylvania State University, 2003).[29]

Thus, Cal-Maine is correct about the perceived benefits consumers attribute to specialty eggs.

42.    Survey data supports this acknowledgement: 81% of respondents to a poll of 1,204 adults nationwide stated that they were "willing to pay more for eggs from chickens" that they know were "raised in a humane manner."[30]

## V.    CLASS ACTION ALLEGATIONS

43.    Under Rule 23 of the Federal Rules of Civil Procedure, plaintiff seeks certification of a class defined as follows:

> All residents of Washington who purchased Organic Marketside eggs from a Walmart supplied by a porch-based industrial egg farm, including but not limited to Nest Fresh's porch-based industrial egg farm located in Canby, Oregon.

44.    Excluded from the class are defendants; the officers, directors or employees of defendants; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of defendants.  Also, excluded from the class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

---

[29] https://www.smallfootprintfamily.com/benefits-of-pasture-raised-eggs.

[30] *U.S. Public Supports Humane* Treatment *for Hens*, Zogby International for Farm Sanctuary (Sept. 2000), accessible at http://www.isecruelty.com/poll.php.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

45.     Plaintiff does not know the exact number of class members at the present time. However, due to the nature of the trade and commerce involved, there appear to be tens if not hundreds of thousands of class members such that joinder of all class members is impracticable.

46.     The class is defined by objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer fraud cases and complex class actions.

47.     There are questions of law and fact common to the class.  Defendants' deceptive marketing and sale of shells eggs similarly impact class members, all of whom purchased and paid more than they should have for shell eggs.

48.     Plaintiff asserts claims that are typical of the class.  Plaintiff and all class members have been subjected to the same wrongful conduct because they all have purchased deceptively advertised shell eggs.  As a result, and like other members of the class, plaintiff purchased and paid an amount for shell eggs which he otherwise would not have paid.

49.     Plaintiff will fairly and adequately represent and protect the interests of the class. Plaintiff is represented by counsel competent and experienced in both consumer protection and class action litigation.

50.     Class certification is appropriate because defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

51.     Class certification is also appropriate because common questions of law and fact substantially predominate over any questions that may affect only individual members of the class, including, *inter alia*, the following:

      a.     Whether defendants advertised their shell eggs as providing the laying hens with access to the outdoors;

      b.     Whether these laying hens did not in fact have access to the outdoors;

      c.     Whether defendants' shell eggs label has the tendency or capacity to deceive;

      d.     Whether defendants' conduct affects the public interest;

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

e.   Whether defendants' conduct violates the Washington Consumer Protection Act

f.   Whether the conduct at issue unjustly enriches defendants at the expense of plaintiff and the class;

g.   Whether the challenged practices harmed plaintiff and members of the class; and

h.   Whether plaintiff and members of the class are entitled to damages, restitution, and injunctive or other relief.

52.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual class members is impracticable. Furthermore, because the injury suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individually and the burden imposed on the judicial system would be enormous.

53.   The prosecution of separate actions by the individual class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

## VI.   CAUSES OF ACTION

### COUNT ONE

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *ET SEQ.*)

54.   Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

55.   The Washington Consumer Protection Act broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. § 19.96.010.

56.   Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

57.     The shell egg labeling complained of herein was deceptive because it had the tendency or capacity to deceive consumers into believing the laying hens were provided with access to the outdoors when in fact they were not, and plaintiff was in fact so deceived.

58.     The deceptive marketing and sale of shell eggs complained of herein impacts the public interest because it occurs in the course of defendants' business on a repeated basis throughout the state of Washington.

59.     Plaintiff and the class have suffered injury in fact, including the loss of money, as a result of defendants' deceptive practices.  Plaintiff and members of the class were directly and proximately injured by defendants' conduct and lost money as a result of defendants' material misrepresentations, because they would not have purchased or paid as much for the shell eggs had they known the truth.

60.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of defendants' business.  Defendants' wrongful conduct is part of a general practice that is still being perpetuated and repeated throughout the State of Washington.

61.     Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin defendants from continuing their unfair and deceptive business practices.  Defendant is liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and any other remedies the Court may deem appropriate under WASH. REV. CODE ANN. § 19.86.090.

**COUNT TWO**

**UNJUST ENRICHMENT**

62.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

63.     Defendants have benefitted and been enriched by the conduct alleged herein.  To the detriment of plaintiff and class members, defendants have and continue to be unjustly enriched as a result of the wrongful conduct alleged herein.  Defendants have unjustly benefited by receiving higher prices for their shell eggs than would have been possible absent the wrongful conduct.  Between the parties, it would be unjust for defendants to retain the benefits attained by its wrongful actions.

HAGENS BERMAN

64.     Defendants have generated substantial revenue from the inequitable conduct described herein.  Defendants have knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of plaintiff and the other class members.

65.     Defendants have voluntarily accepted and retained this benefit.

66.     Plaintiff and the other class members are entitled to the amount of defendants' ill-gotten gains resulting from their wrongful conduct as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter a judgment against defendant and in favor of plaintiff, and grant the following relief:

A.     Determine that this action may be maintained as a class action with respect to the class identified herein and certify it as such under Rules 23(b)(2) and/or 23(b)(3), or alternatively certify all issues and claims that are appropriately certified, and designate and appoint plaintiff as class representative and his counsel as class counsel;

B.     Declare, adjudge and decree the conduct of defendants as alleged herein to violate the Washington Consumer Protection Act and unjustly enrich defendants;

C.     Enjoin defendants from continuing the unfair and deceptive marketing of its shell eggs;

D.     Award plaintiff and the class damages and restitution of all monies paid to defendants as a result of its unfair and deceptive business practices;

E.     Award plaintiff and the class reasonable attorneys' fees, costs, and pre- and post-judgment interest; and

F.     Award plaintiff and the class such other further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

**JURY TRIAL DEMAND**

Plaintiff, by counsel, requests a trial by jury for all claims so triable.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   DATED:  March 2, 2018                  HAGENS BERMAN SOBOL SHAPIRO LLP

2                                          By: */s/ Steve W. Berman*

3                                          Steve W. Berman (WSB 12536)
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
4                                          1918 Eighth Avenue, Suite 3300
                                           Seattle, WA  98101
5                                          (206) 623-7292
                                           *steve@hbsslaw.com*
6
                                           Elaine T. Byszewski (*pro hac vice* pending)
7                                          301 N. Lake Avenue, Suite 920
                                           Pasadena, CA  91101
8                                          (213) 330-7150
                                           elaine@hbsslaw.com
9
                                           *Attorneys for Plaintiff and the Proposed Class*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                  - 21 -

010691-13 1005682 V21

